**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAUL D. HARPER; BRIAN D. LIDDY;
EDWARD ORTIZ,
            *Plaintiffs-Appellees,*

            v.

CITY OF LOS ANGELES, a
municipality; BERNARD PARKS,
            *Defendants-Appellants,*

            and

COUNTY OF LOS ANGELES; GIL
GARCETTI; LAURA LAESECKE; ANNE
INGALLS; RAFAEL PEREZ,
            *Defendants.*

No. 06-55519

D.C. No.
CV-03-00959-CJC

PAUL D. HARPER; BRIAN D. LIDDY;
EDWARD ORTIZ,
            *Plaintiffs-Appellees,*

            v.

CITY OF LOS ANGELES, a
municipality; BERNARD PARKS,
            *Defendants-Appellants,*

            and

COUNTY OF LOS ANGELES; GIL
GARCETTI; LAURA LAESECKE; ANNE
INGALLS; RAFAEL PEREZ,
            *Defendants.*

No. 06-55715

D.C. No.
CV-03-00959-CJC

OPINION

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

8611

Argued and Submitted
November 7, 2007—Pasadena, California

Filed July 14, 2008

Before: Jerome Farris and Richard A. Paez, Circuit Judges,
and Frederic Block,* District Judge.

Opinion by Judge Paez

_____

*The Honorable Frederic Block, Senior United States District Judge for
the Eastern District of New York, sitting by designation.

**COUNSEL**

Edward J. Horowitz, Office of Edward J. Horowitz, Pacific Palisades, California; Dale B. Goldfarb, Harrington, Foxx, Dubrow & Canter, Los Angeles, California, for the defendants-appellants.

Jeffrey Isaac Ehrlich, The Ehrlich Law Firm, Claremont, California; Joseph Y. Avrahamy, Law Offices of Joseph Y. Avrahamy, Encino, California; Etan Z. Lorant, Law Offices of Etan Z. Lorant, Encino, California, for the plaintiffs-appellees.

---

**OPINION**

PAEZ, Circuit Judge:

This case arises from the Los Angeles Police Department's ("LAPD") investigation and prosecution of three former police officers, Paul Harper, Brian Liddy, and Edward Ortiz. These officers were implicated in wrongdoing by former LAPD officer Rafael Perez in an event that came to be known as the "Rampart Scandal"—an event that, based on Perez's own unlawful conduct and his allegations of corruption at the Rampart Division, launched an internal investigation that ultimately implicated scores of police officers, overturned dozens of convictions, and generated intense media scrutiny. The criminal charges against these officers resulted in acquittals. Harper, Liddy, and Ortiz (the "Officers") subsequently brought suit against a number of actors, including Perez, the district attorneys, the City of Los Angeles, and former Chief of Police Bernard Parks for violations of their constitutional civil rights under 42 U.S.C. § 1983, contending among other claims that the defendants had conducted an improper and negligent investigation, and that they had been arrested without probable cause for falsifying a police report and conspiring to file such a report.

The Officers' claims against the County of Los Angles, District Attorney Gil Garcetti, Rafael Perez, and Deputy District Attorneys Laesecke and Ingalls were dismissed on Federal Rule of Civil Procedure 12(b)(6) motions or motions for summary judgment, and the case proceeded to trial against the City of Los Angeles and Chief Parks ("the City"). After an eleven-day trial, the jury returned a special verdict in favor of the Officers, finding that the Officers' constitutional rights were violated by the City and by Chief Parks in his official capacity.[1] The jury awarded each officer compensatory damages in the amount of $5,000,001. The City thereupon filed a number of post-judgment motions, including a renewed motion under Rule 50(b) for judgment as a matter of law. The district court denied the motions, and the City appealed. We affirm. "[W]e do not lightly cast aside the solemnity of the jury's verdict." *Graves v. City of Coeur D'Alene*, 339 F.3d 828, 844 (9th Cir. 2003). Both the jury's verdict and the jury's damages award are supported by substantial evidence. We also affirm the district court's challenged evidentiary rulings. Because we affirm both the verdict and the district court's determination on the post-judgment motions, we also affirm the district court's award for attorney's fees under 42 U.S.C. § 1988.[2]

## I.   Background

In March 1998, several kilos of cocaine were found missing from an LAPD evidence locker. The investigation soon focused on Rafael Perez, a police offer who, at that time, was working in Rampart's elite narcotics and anti-gang

---

[1]The jury also determined that Chief Parks did not act "with malice, fraud, or oppression" toward the accused Officers.

[2]The City challenges the award of attorney's fees under 42 U.S.C. § 1988, but only in the event that we reverse the judgment underlying the fee award. They do not otherwise contest the Officers' entitlement to fees or the amount of the award. Accordingly, because we affirm the judgment, we affirm the district court's award for attorney's fees.

C.R.A.S.H. (Community Resources Against Street Hoodlums) unit. Perez was arrested and charged with the theft, but the jury ultimately deadlocked 8-4 in favor of conviction. In lieu of a retrial, Perez entered into a confidential plea agreement with the prosecution, wherein he agreed to identify other police officers involved in crimes or misconduct in exchange for a reduced sentence on the drug charges and immunity from further prosecution on misconduct short of murder.

Upon entering his plea pursuant to the agreement, Perez gave extensive interviews to the District Attorney's Office and the LAPD, the transcripts of which totaled some three thousand pages. Some of those interviews consisted of information that Perez volunteered, but the LAPD in conjunction with the District Attorney's office also provided Perez with 1,500 arrest reports prepared by the Rampart Division's C.R.A.S.H. unit, from which he made additional allegations.[3] When Perez's accusations, many of which were spectacular, leaked to the media, Chief Parks formed the Rampart Corruption Task Force ("the Task Force") to investigate those allegations.

One of the cases that Perez flagged from the arrest reports was the arrest of Allan Manriques Lobos ("Lobos") on April 26, 1996, which also came to be known as the "parking lot incident" and implicated Officers Harper, Liddy and Ortiz.

Because the Lobos arrest—during which Perez alleged that the Officers planted a gun on Lobos—is central to this appeal, what follows is a detailed account of the facts of that arrest as explained at trial. Given the jury verdict for the Officers,

---

[3]The LAPD in conjunction with the District Attorney's office provided the CRASH unit arrest reports to Perez. At trial, Detective Tyndall, who supervised the work of the Task Force, testified that the relationship was as follows: "[T]he police department was tasked with investigating. We did have a district attorney assigned to us who met with us every day, and so he assisted with the investigation . . . ."

the Officers are "entitled to have the evidence viewed in a light most favorable to [them], resolving conflicts in [their] favor and giving [them] the benefit of reasonable inferences, to determine whether substantial evidence supported the verdict." *Murphy v. F.D.I.C.*, 38 F.3d 1490, 1495 (9th Cir. 1994). That account is followed by Perez's accusations about the arrest, and a brief chronicle of the subsequent Task Force investigation, which resulted in the arrest and criminal trial of the Officers. Whether the Officers' arrest for those charges violated their constitutional rights, whether those violations were the result of the City's policy, custom, or pattern, and whether the violations caused damages are the central issues on appeal in this case.

## A.   The Lobos Arrest

On April 26, 1996, at 22:30 (10:30 p.m.), a call came in to the Rampart C.R.A.S.H. unit that shots had been fired near the 1700 block of Third Street. Liddy and Harper responded, as did other C.R.A.S.H. officers. As their vehicle approached the intersection of Fourth and Hartford streets, Liddy and Harper noticed a group of gang members standing near the entrance of a parking lot known to be a hangout for the "18th Street" Gang. The officers decided to detain them to investigate whether they were connected either to the shots-fired call or to a shootout several days earlier in which Frosty, a member of the rival Rockwood gang, had been killed.

At Liddy's suggestion, Harper got out of the car and Liddy drove toward the back of the lot to prevent anyone from escaping through a hole in the back fence. Harper followed Liddy's car into the parking lot and then took cover. When the gang members saw Liddy pull up, two males made a run for the fence; then a third male started running. When Liddy arrived at the other end of the parking lot, he radioed a request for back-up and for an airship (LAPD helicopter), and got out of the car. Liddy's call for back up was recorded on the communications tape at 22:39.

As Harper dealt with the group at the front of the lot, which included a known soldier of the Mexican Mafia called Termite, Liddy dealt with the runners. Harper saw one of the males, who turned out to be Lobos, running between some parked cars with his hand on his waistband. Harper yelled at him to stop, but Lobos did not stop and he disappeared from Harper's view. Liddy noticed that Lobos had a gun in his waistband and yelled "gun." Harper took cover behind the engine block of one of the parked cars and tried to keep control of the group in front of him. Liddy illuminated Lobos with his flashlight and he observed Lobos crouch down by the left front tire of one of the parked cars, a blue Honda. At the sound of the approaching helicopter, Lobos stood up and surrendered, telling Liddy, "Don't shoot, I ain't got no gun."

Within moments, at 22:42, the back-up units arrived, one including Ortiz and one including Perez. The airship, over cross-talk on the communications tape, radioed, "Air 3 to Rampart control, is there a request?" At 22:44 Ortiz, who on arrival became the commanding officer at the scene, radioed a "Code 4" indicating that enough units had arrived on the scene to control the situation. Liddy informed Ortiz that he had one individual in custody for possession of a gun and that he needed the parking lot and the roof of the adjacent building cleared. Both Liddy and Ortiz proceeded to communicate with the airship on a local, unrecorded frequency, and the pilots checked the area with infrared in an attempt to locate the runners. Liddy directed Perez to look for a gun near where Lobos had been crouching. Perez returned with a loaded .45 pistol. Liddy wrote in his report that Perez had recovered the weapon, but Perez did not tell Liddy that he had been directed to the gun's location by a patrolman named Ray Mejia.[4] Mejia's Daily Field Activity Report (DFAR) showed that he arrived at the scene with the other back-up units at 22:40, but

---

[4]The Task Force ultimately determined, that Liddy did not know that Officer Mejia had played a role in recovering the weapon when he wrote his report.

because he forgot to radio his arrival, the communications tape did not record his location until 23:07 when he radioed, "Show me out to Fourth and Hartford."

Seven gang members, including Lobos, were detained and brought to the station to establish their identities and to see if they could provide any intelligence on the Frosty shooting. Five women who were initially detained at the scene were not brought to the station. Lobos was booked some hours later for possession of a firearm. The charge was a felony because Lobos had a prior conviction. Sergeant Dickerson, who was present in the parking lot and later recalled being told of someone running with a gun at the scene, noted in his log that a gun was recovered, but did not make a note of the arrest, which took place after his shift had ended.

## B.    Perez's Accusations about the Lobos Arrest

Three years after the Lobos arrest, but before the Task Force's criminal investigation of the Officers, Perez gave two statements about the Lobos arrest, among hundreds of others, as part of his plea arrangement. Perez gave those statements in the presence of LAPD Internal Affairs, representatives from the District Attorney's office, and Perez's personal lawyer.

In his first statement, given on October 15, 1999, Perez, having reviewed Liddy's arrest report, described all of the units arriving together at the scene of a party where a DJ was playing and "people were moving around and trying to get away, and—and all this stuff. And [then] everybody was in custody . . . we were looking around . . . taking apart [the DJ's] speakers." It was at that point a patrol officer, not Liddy, directed Perez to the gun. Perez stated that "because . . . [we] had these guys in custody for some time," and the units arrived together there was "no way" Liddy could have seen Lobos put the gun where it was found.

In a second statement given three months later, on January 27, 2000, Perez repeated some parts of his account, but changed others.[5] He again described the units arriving at the parking lot "pretty much at the same time" and that there was "a deejay [booth] back there." This time, however, Perez stated that the incident was planned in advance and that Liddy's report of the arrest was "a complete fabrication." It was "Liddy's caper" and "I know we were made aware of this. And [that] we were gonna hit [the location] all at one time . . . Liddy was handling it."

In particular, Perez repeated his denial of Liddy's account of Lobos running between the parked cars holding his waistband. Perez stated that no one ran and if he had seen that happen, "the scenario would have been different . . . we would have proned [Lobos] out." Perez also reiterated his denial that Liddy had directed him to look for Lobos' gun.

Perez then added the allegation that when he handed the gun to Liddy, Liddy and Harper proceeded to have a discussion about which gang member the gun would be placed on. According to Perez, Liddy asked "Who is going to go for this gun?" Perez was uncertain whether Ortiz, who was the commanding officer at the scene and who signed Liddy's arrest report, overheard the discussion.

## C.  Task Force Investigation of the Lobos Arrest

Three months after Perez's second statement, on March 27, 2000, Detectives Barling and Skaggs were assigned to the Task Force investigation of the Lobos arrest. Barling and Skaggs were supervised by Detective Brian Tyndall, who reported up a chain of command that ended with Chief Parks. Also working with Barling and Skaggs were deputy district

---

[5]The City did not provide this court with a transcript of Perez's second statement. We relied on the excerpts of his statement provided by the Officers.

attorneys Laura Laesecke and Richard Rosenthal. With less than one month before the statute of limitations would run on any possible criminal charges arising out of the Lobos arrest, the detectives "rushed" the investigation, as they later admitted.

### 1.   Third Perez Interview

On April 12, 2000, Barling and Skaggs conducted a third interview with Perez.[6] Before asking Perez any questions, they allowed Perez to listen to the communications tape of the arrest, supplied him with a photo of the parking lot, Liddy's arrest report, copies of his prior statements, a diagram of the area, a copy of his Daily Field Activity Report (DFAR), and copies of the daily work sheets of all relevant CRASH officers.

Barling opened the interview by stating, "[T]here's a bunch of holes in your previous statements . . . . If you don't mind, just start from the beginning." This time, Perez stated that by the time he arrived, the gang members had already been detained—a version consistent with the communications tape that had just been played. Again, however, Perez described the scene of a party, and a DJ with "a couple of speakers and a couple crates of records." Perez stated that Liddy and Harper could not have seen someone "get between a car and place a gun there." Perez stated if that had happened "my gun would've been drawn . . . ." Rather, Perez had been standing around for "some minutes" waiting to begin searching some of the gang members, when a patrolman—this time Perez identified him as Officer Mejia—pointed him to the gun.

In this version, when Perez gave the gun to Liddy, Perez equivocated about whether Harper or Ortiz heard Liddy's comment about who would "go for the gun." "[W]as Sargent

---

[6]As with Perez's second statement, we rely on the excerpts of the interview provided by the Officers.

[sic] Ortiz in a position to hear it? . . . I think at least Harper heard it."

## 2. Task Force Determination of Probable Cause

The Task Force determined that probable cause existed for the Officers' arrest based on a "totality of the circumstances" analysis. Perez's accusations contributed to their assessment. Although Task Force detectives Barling and Skaggs recognized that Perez was "a criminal and a proven liar," and that there were "inconsistencies" between Perez's statements and the Task Force's conclusions about the Lobos arrest— including that the raid was not pre-planned and that there was never a DJ at the scene—the detectives relied on uncorroborated accusations by Perez to establish probable cause. For example, with respect to Perez's allegations that the Officers held a conversation about planting the gun on Lobos, Skaggs admitted that the allegation was "not corroborated" by any other witness, but that the accusation nonetheless was "absolutely" part of his probable cause determination.

Barling and Skaggs also considered other factors in their totality analysis. They made a series of deductions involving the time-stamped communications tape, which they claimed exposed inconsistencies in Liddy's account and supported probable cause that a crime had been committed. First, they concluded that the radio broadcast at 22:43 from the airship— "Air 3 to Rampart control, is there a request"—meant that the airship had not arrived when Ortiz and other units began arriving one minute earlier at 22:42. Therefore, if Lobos had stood and surrendered with the arrival of the airship as Liddy reported, at least some of the back-up units would have seen it happen. The failure of other officers, including the airship's pilots, to see Lobos running or surrendering was crucial to the determination that Liddy's arrest report and Harper's declaration of probable cause for Lobos' arrest were false. Also, because Ortiz's arrival at the scene would have placed him in

a position to see the event that Liddy reported, Ortiz also must have known that the officers' reports were false.

The Task Force also deduced that Mejia's radio transmission—"Show me out to Fourth and Hartford"—established that he arrived at the scene at 23:07, almost thirty minutes after Liddy called for backup. Mejia's late arrival was critical to the probable cause determination because proper police procedure would have been to retrieve the gun immediately. If Mejia directed Perez to the gun long after Lobos' alleged surrender, Liddy could not plausibly have seen Lobos with the gun or directed Perez to where the gun was hidden; thus Liddy's report, which Ortiz approved, and Harper's declaration had to be false.

Barling and Skaggs also drew conclusions from the log entries by various officers for the night of the arrest. Sergeant Ortiz's log showed that "one suspect was armed with a .45 caliber handgun." Sergeant Dickerson's log reflected that "evidence had been booked," but not that anyone had been arrested. The detectives concluded that this discrepancy was "very significant" and drew the inference that Liddy and Ortiz had decided to "place" the gun on Lobos after Dickerson had gone off-duty.

### 3.   Arrest and Aftermath

District Attorney Garcetti testified that he spoke with Chief Parks six to twelve times about the Rampart investigation and that he and his deputies were "hounded" by the LAPD to file criminal charges against the police officers implicated in the Rampart Scandal. Garcetti testified that in a frank telephone exchange Chief Parks told him that even if the district attorney did not have sufficient evidence to prosecute, "Let's get the case behind us. If we prosecute the case, even if you lose the case, it's over. It's done." Garcetti also expressed dissatisfaction with the quality of the LAPD investigation and Parks' representation that Perez was credible. He thought that Parks

himself was "intentionally hampering" the investigation and that the Task Force was more interested in protecting the reputation of the LAPD than in finding wrongdoing anywhere but at the rank-and-file level.

On April 24, 2000, two days before the statute of limitations would have run on any charges arising out of the Lobos arrest, a felony complaint was filed by the District Attorney against the Officers. Liddy and Ortiz were charged with filing a false police report; Harper was charged with filing a perjured declaration. All three Officers were charged with conspiring to file a false report and to commit perjury.[7] Barling himself signed the probable cause declaration attached to the complaint. As Tyndall explained, while the decision to file charges was made by the District Attorney's office, it was the LAPD that investigated the case and made the arrest.

Initially, the LAPD intended to arrest the Officers publically and parade them in front of the media. The Officers only learned that they were going to be arrested from a front-page article in the Los Angeles Times, which stated that they were to be arrested "like any other criminal." The Officers immediately left their homes and arranged, after several hours of negotiations, to turn themselves in. They were booked, fingerprinted, and released on bail.

On November 15, 2000, a jury returned a not-guilty verdict for all three officers as to all charges stemming from the

_____

[7]On July 10, 2000, the District Attorney amended the charges against Liddy and Ortiz to include crimes stemming from the so-called "alley" incident, which arose when a gang member allegedly drove a pickup truck through an alley and struck Liddy and another officer, Michael Buchanan. Perez claimed the entire incident was fabricated. The subsequent jury trial included charges related to this incident, as well as the charges against the Officers related to the Lobos arrest.

Lobos arrest. *People v. Ortiz*, L.A. County Super. Ct., No. BA204531.[8]

After the trial, the LAPD issued a press release quoting Chief Parks as stating that the jury's verdict sent a clear message that misconduct would not be tolerated. Chief Parks went on to say, "Though a painful admission, it is important to note that true reform efforts of the Los Angeles Police Department, began as a result of the LAPD's expeditious and exhaustive investigation into the Rampart Corruption Scandal. . . . I would like to offer my thanks to [the Task Force] . . . for their arduous investigative efforts in this onerous matter."

## II.  Standard of Review

We review *de novo* the district court's denial of a renewed motion for judgment as a matter of law.[9] *Gilbrook v. City of Westminster*, 177 F.3d 839, 864 (9th Cir. 1999). A renewed motion for judgment as a matter of law is properly granted "if

---

[8]As to the charges stemming from the "alley incident," the jury returned guilty verdicts. Those convictions were all overturned when the trial judge granted a new trial because of an instructional error regarding an element of the crime for which the officers were convicted. The State Court of Appeal affirmed the new-trial order. *See People v. Ortiz*, 2004 WL 1545402 (Cal. App. 2 Dist., Oct. 13, 2004). The District Attorney subsequently declined to re-try the case.

[9]In the posture in which we review this case, the standard of review for the denial of a motion for judgment as a matter of law is the same as the standard of review for reviewing a jury's verdict: both the verdict and the denial of the motion must be affirmed if there is substantial evidence to support the verdict. *Gilbrook*, 177 F.3d at 856 (quoting *Landes Constr. Co. v. Royal Bank*, 833 F.2d 1365, 1370-71 (9th Cir. 1987)). The City argues that the standard of review is *de novo* because the questions presented are "mixed questions of law and fact." This contention is without merit. The City cites to no case in this circuit—and there are none—where a panel in a § 1983 case has analyzed the denial of a Rule 50(b) motion *de novo* on the basis that there are "mixed" questions. The City's attempt to have this court perform a *de novo* review that would disregard the jury's verdict is inappropriate both with respect to the posture of this case and with respect to the specific, animating factual disputes.

the evidence, construed in the light most favorable to the non-moving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Id.* In making this determination, the court must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion. *Id.* at 1227-28. While the court must review the entire evidentiary record, it must view all evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in the favor of the non-mover, and disregard all evidence favorable to the moving party that the jury is not required to believe. *Id.* at 1227. If sufficient evidence is presented to a jury on a particular issue and if the jury instructions on the issue stated the law correctly, the court must sustain the jury's verdict. *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1014 (9th Cir. 1985). Here, there is no dispute that the jury was properly instructed and, in protecting the province of the jury, we do not weigh the evidence or make credibility determinations in assessing the propriety of granting judgment as a matter of law. *See, e.g.*, *Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 189 (9th Cir. 1989); *Landes Constr. Co. v. Royal Bank*, 833 F.2d 1365, at 1371 (9th Cir. 1987). The jury is the "constitutional tribunal provided for trying facts in courts of law." *Berry v. United States*, 312 U.S. 450, 453 (1941).

## III.   Discussion

The jury returned special verdicts finding that the Officers' constitutional rights were violated;[10] that the violations were

---

[10]At trial, the Officers offered two theories under which the City violated their constitutional rights. First, they argued that they were arrested without probable cause in violation of their Fourth Amendment rights.

the result of the City's official policy, custom or pattern; and that the violations caused damages.

## A.   Constitutional Violation

**[1]** First, there was substantial evidence from which the jury could conclude that the Officers were arrested without probable cause. An arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under § 1983. *McKenzie v. Lamb*, 738 F.2d 1005, 1007 (9th Cir. 1984).

**[2]** Probable cause to arrest exists when "officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "While conclusive evidence of guilt is of course not necessary under this standard to establish probable cause, '[m]ere suspicion, common rumor, or even strong reason to suspect are not enough.' " *Id.* (quoting *McKenzie*, 738 F.2d at 1008). Under the collective knowledge doctrine, in determining whether probable cause exists for arrest, courts look to "the collective knowledge of all the officers involved in the criminal investigation." *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007) (citation and quotation marks omitted). Where the facts or circumstances surrounding an individual's arrest are

---

Second, they argued that the outcome of the Task Force's investigation was predetermined in violation of due process. The special verdict asked the jury to determine only whether "constitutional rights [were] violated." Because there is substantial evidence from which the jury could have concluded that the Officers' arrest lacked probable cause, we need not address whether the Officers' due process rights were also violated.

disputed, the existence of probable cause is a question for the jury. *McKenzie*, 738 F.2d at 1008. That is the case here.[11]

Our inquiry is whether, "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao*, 307 F.3d at 918. That is, in the context of a Rule 50(b) determination, we ask whether the *only* conclusion that a reasonable jury could draw was that probable cause existed to charge Liddy, Harper, and Ortiz with filing a false report, committing perjury, and conspiring to do so. The evidence produced by the City does not compel such a conclusion. Rather substantial evidence supports the jury's determination.

**[3]** In establishing probable cause, the Task Force primarily relied on two pieces of information: the several deductions made from the communications tape, and the discrepancy between the log kept by Sergeant Ortiz and the log kept by Sergeant Dickerson. The jury, however, was entitled to dis-

---

[11]As previously noted, the City argues that because probable cause is a "mixed question of law and fact" we should review the question *de novo* without regard for the jury's verdict. In support of that proposition, the City cites two cases, one in which probable cause was reviewed *de novo* in the context of a habeas corpus proceeding and the other in which probable cause was reviewed *de novo* in the context of a direct review of a criminal arrest. *See Paretti v. United States*, 112 F.3d 1363, 1368 (9th Cir. 1997); *United States v. Hernandez*, 80 F.3d 1253, 1260 (9th Cir. 1996). As this court has held, however,

> Our task in determining whether probable cause to arrest existed as a matter of law in this § 1983 action is slightly different from a similar determination in the context of a direct review of a criminal arrest. In the latter situation, we are called upon to review both law and fact and to draw the line as to what is and is not reasonable behavior. We are not always in agreement as to its location, but a line must be drawn. By contrast, in a § 1983 action the factual matters underlying the judgment of reasonableness generally mean that probable cause is a question for the jury.

*McKenzie*, 738 F.2d at 1007-1008.

credit the inferences the Task Force detectives drew in order to substantiate their probable cause determination. *See, e.g.*, *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1431 (9th Cir. 1996). It was entirely within the jury's prerogative to find more credible the accused Officers' version of the facts surrounding the Lobos arrest, and there was substantial evidence that the Lobos arrest occurred as Liddy, Harper, and Ortiz reported that it had.

**[4]** First, the jury heard evidence that could substantiate the conclusion that the communications tape did not establish that the Lobos arrest was false. The detectives overlooked that airships can be heard by officers on the ground while the airship is, technically, still en route to a call. Tyndall conceded that Liddy could have heard the airship at the time of Lobos' surrender, even though the craft was not directly overhead. Upon hearing the sound of a helicopter, it is fair to say it had "arrived," which was Liddy's choice of word in the arrest report. In addition, witnesses at the scene corroborated that the airship arrived shortly after Harper and Liddy, and the airship's log shows that the airship responded to Liddy's call for backup at 22:40. Nor did the recorded message "Air 3 to Rampart control, is there a request?" convey the direct message of "arrival" at the scene that the detectives assumed, which would have been a "Code 6." The transmission occurred over significant cross-talk on the communications tape, and despite an extensive interview and the fact that the timing of the airship's "arrival" was crucial to the detective's probable cause determination, the detectives neither asked Officer Marczinko, who was on the airship at the time, what the message meant, nor played him the communications tape. Rather, Detective Barling began with the assumption that the airship had not arrived overhead and then chose between two determinations: "[e]ither all [Liddy's] observations occurred before the two and a half minutes, which would mean that [Liddy's arrest report] was fabricated. Or that somehow prior to that two and a half minutes the airship was there and gone[,

which] made no sense based on the communication tape I heard." The jury was entitled to discredit his explanation.

The jury was also entitled to believe that Officer Mejia's radio call at 23:07—"Show me out to Fourth and Hartford"—was not a call of arrival, which would have been a "Code 6," but rather an indication he had forgotten to radio when he arrived with the other back-up units around 22:40. Mejia's DFAR—rounded in five-minute increments—showed him arriving at the scene before Ortiz's radio of "Code 4"at 22:40, as does the log of the probationary officer riding with Mejia that evening. Nor did Mejia himself ever state that he arrived at 23:07—although a paraphrased summary of his formal statement prepared by Task Force detectives represents that "Mejia recalled that he had responded to a disturbance call at [Fourth and Hartford]" at 23:07. An arrival at 23:07 would conflict with the rest of Mejia's account that he, in fact, arrived with the other back-up units and that he remembered seeing the airship, which ended its call at the scene at least fifteen minutes before the Task Force determined that Mejia arrived. Nor did the Task Force—which determined that Mejia's arrival was "part of the key part" of establishing probable cause—ever account for—or even ask—why Mejia, a patrolman and not a C.R.A.S.H. officer, would show up twenty minutes after Ortiz's "Code 4." On this record, the jury had substantial evidence from which to conclude that Mejia arrived with the other back-up units and came across the gun shortly thereafter, corroborating Liddy's account of the arrest.

The jury also heard evidence that supported the conclusion that the differences between the logs kept by Dickerson and Ortiz did not reflect that a crime had been committed. Rather, the discrepancy could be explained by the fact that Dickerson went off shift at 1:00 a.m., before Lobos was booked. Such a delay in processing an arrest was not unusual, as the Task Force detectives conceded. Moreover, Dickerson otherwise recalled that he had been told at the scene that a suspect had

been seen running with a gun, although he did not recall having a specific conversation with Liddy about the gun.

The Officers also pointed to additional evidence that went uncredited by investigators. One witness interviewed by the Task Force stated that, on the arrival of the police, one of the gang members ran toward her car and appeared to trip or crouch down. This witness was the owner of the car in whose wheel well the gun was later found. The Task Force also ignored evidence that Perez was making false accusations despite learning that Perez had boasted that he could plant an investigation on any officer he wanted to, saying "if someone pisses me off, I'll throw their name in the hat and they will get investigated, innocent or not." Although Tyndall knew of these accusations, he never provided the information to Skaggs or Barling; nor was the information ever provided to Deputy District Attorney Laura Laesecke before charges against the Officers were filed.

**[5]** On this record, we cannot say that the evidence permits only a conclusion that is contrary to the jury's verdict. It was entirely within the jury's prerogative to find more credible the Officers' version of the facts surrounding the arrest and the jury was entitled to disregard the City's account of the incident, which was fraught with unreasonable inferences, discrepancies, and material omissions. Where, as here, there is "such relevant evidence as reasonable minds might accept as adequate to support [the jury's ] conclusion," the court must affirm the district court's denial of the Rule 50(b) motion. *Gilbrook*, 177 F.3d at 856 (internal quotations and citation omitted).

## B.  Policy, Custom, or Pattern

**[6]** A municipality may be held liable under § 1983 only where an "action pursuant to official municipal policy of some nature causes a constitutional tort." *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978). Municipal liability

under *Monell* is established where "the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 417 (1997). Such a policy may either be "explicitly adopted" or "tacitly authorized," *Gibson v. United States,* 781 F.2d 1334, 1337 (9th Cir. 1986) (citing *Monell*, 436 U.S. at 690-91), but the "decision to adopt [a] particular course of action . . . by th[e] government's authorized decisionmakers . . . surely represents an act of official government 'policy,' " *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Because the jury was instructed that Chief Parks was an authorized policymaker on police matters, Chief Parks' decision to "ma[ke], or ratif[y] a decision that deprived plaintiffs of their constitutional rights would suffice for official liability under *Pembaur*." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991). The question is whether there is substantial evidence to support the jury's determination that the constitutional violations were the result of an official policy set by Chief Parks. We conclude that there is.

**[7]** The jury reasonably could have concluded that Chief Parks' telephonic statements to District Attorney Garcetti, in which Parks expressed confidence in Perez and pressured Garcetti to file criminal charges without a complete or fully corroborated investigation, were indicative of an official policy whereby the City "impliedly or tacitly authorized, approved, or encouraged illegal conduct by its police officers." *Gibson*, 781 F.2d at 1337 (internal quotations and citation omitted).[12] Indeed, the Task Force's chain-of-command

---

[12]The City claims that Parks' statements to Garcetti were not "official" nor did they represent a "policy." There is no evidence, however, that the statements made by Chief Parks to Garcetti were personal or social calls not related to their official duties. The content of their telephone conversations is starkly to the contrary. And the City cites no precedent that such calls, which were properly admitted into evidence, cannot be evidence of an official policy. Indeed, where the principal allegations in this case include that Parks, who was the official policy maker, set upon a policy that condoned and encouraged a biased, incomplete investigation, Chief Parks' own statements appear especially relevant. *See Larez*, 946 F.2d at 642.

reported regularly to Parks and the jury was entitled to believe that Chief Parks' expressions as the official policymaker accurately reflected the direction and quality of the Task Force investigation, which was to ready cases for the filing of charges as quickly as possible, with or without probable cause.

[8] The jury also heard ample testimony that the Task Force conducted itself in precisely this manner. This testimony constitutes substantial evidence because the act of the municipality is the act not only of an authorized policymaker, but of employees following the policymaker's lead. *Bd. of County Comm'rs*, 520 U.S. at 417. First, the jury heard testimony from Sergeant Jose Pasqual, who worked for the Task Force interviewing prisoners that Perez claimed had been wrongfully incarcerated. Sergeant Pasqual testified that his "immediate bosses and higher-up[s] . . . believed everything Perez was saying." Sergeant Pasqual also testified as to the resistance and retaliation he encountered when he tried to inform other detectives that Perez was lying. The jury also heard testimony that the Task Force had "overlooked" the development of information that Perez was accusing innocent officers, that other Task Force investigations that may have impugned Perez's credibility were prematurely foreclosed, and that two Task Force detectives confronted with questions about Perez's credibility responded by stating: "This is not about the truth." The jury also heard testimony and received documentary evidence that Barling and Skaggs coached Perez to fix the holes in his story rather than confront him with his inconsistent account of the Lobos arrest, that the Task Force prepared paraphrased statements that did not accurately reflect the testimony of witnesses, and that the Task Force did not credit any evidence that did not support its theory that the Officers committed a crime.

[9] The jury also could have supported their determination of an official policy from the failure of Parks to take any remedial steps after the officers were acquitted on all charges

related to the Lobos arrest and it became clear that the Task Force investigation was flawed. *See McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986) ("Policy or custom may be inferred if, after [constitutional violations occurred], . . . officials took no steps to reprimand or discharge the[ir subordinates], or if they otherwise failed to admit the [subordinates'] conduct was in error."). In this case, after the Officers were acquitted, but before the court ordered a new trial on the charges stemming from the alley incident, the LAPD issued a statement quoting Chief Parks' praise for the Task Force's "exhaustive" investigation and thanking Tyndall, Barling, and Skaggs for their "arduous investigative efforts in this onerous matter." Parks also testified that he believed that the Task Force had done an excellent job, stating, "In total, the investigation, in my judgment, was an outstanding investigation." From these statements, the jury could have reasonably concluded that the City and Chief Parks approved of the Task Force's tactics, even after the Officers were acquitted of the Lobos-related charges and there were indications that the investigation was flawed. On the basis of this evidence, the jury could have reasonably concluded that this was not a case where Task Force investigators deviated from the official policy, but rather one in which the policy was effectively carried out.

## C. Causation

**[10]** In a § 1983 action, the plaintiff must also demonstrate that the defendant's conduct was the actionable cause of the claimed injury. *See, e.g.*, *Arnold v. IBM Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981). To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation. *See Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996); *Arnold*, 637 F.2d at 1355. Where the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law, resolving issues of fault and causation is "straightforward" because proof of such a violation "establishes that . . . the municipal action was the

moving force behind the injury of which the plaintiff complains." *Bd. of County Comm'rs*, 520 U.S. at 404-05.

**[11]** That is the case here. The jury was instructed that proximate cause exists where "an act or omission played a substantial part in bringing about or actually causing the injury or damage to plaintiffs," and the jury determined that the City's policy, which violated the Officers' constitutional rights, caused their damages. There is substantial evidence to support the jury's verdict.[13] Chief Parks and the Task Force were instrumental in causing legal proceedings against the Officers and the Task Force's policy of readying cases for the filing of charges as quickly as possible, with or without probable cause had the patently foreseeable consequence of causing the Officers' arrest without probable cause. The unconstitutional policy at issue and the particular injury alleged are not only "closely related," *City of Canton v. Harris*, 489 U.S. 378, 391 (1989), they are cause and effect.

**[12]** The City nevertheless claims that any violation of the Officers' constitutional rights by the Task Force was not the proximate cause of their arrest or their prosecution because

---

[13]The City's contention that this court reviews this kind of causation *de novo* as a mixed question of fact and law is without merit. In *Tahoe-Sierra*, which involved an action under § 1983, we explained exactly the opposite:

> Like other factual determinations, causation-in-fact is reviewed for clear error. In addition, we review findings of proximate cause for clear error, even though they present mixed questions of law and fact. *See Exxon Co. v. Sofec, Inc.*, 54 F.3d 570, 576 (9th Cir.1995) (holding that, although it "is an exception to the general rule that mixed questions of law and fact are reviewed *de novo*," issues of proximate cause are reviewed under the clearly (erroneous standard); *George v. City of Long Beach*, 973 F.2d 706, 709 (9th Cir. 1992); *Britton v. Price*, 950 F.2d 602, 604 (9th Cir. 1991).

*Tahoe Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 216 F.3d 764, 783 (9th Cir. 2000).

there would not have been any arrests but for the District Attorney's decision to prosecute. In the ordinary course, this argument—which the City does not otherwise support with any relevant case law—would not be without merit.[14] It is a well-settled principle that the "[f]iling of a criminal complaint immunizes investigating officers . . . from damages suffered thereafter because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that time." *Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir. 1981) (*Smiddy I*). A § 1983 plaintiff may rebut this presumption, however, by "showing that the district attorney was pressured or caused by the investigating officers to act contrary to his independent judgment." *Id.* at 266. Such evidence must be substantial, *see Newman v. County of Orange*, 457 F.3d 991, 994-95 (9th Cir. 2006) (rebuttal evidence cannot consist merely of a plaintiff's own account of events), but here the jury had ample support for the proposition that "the prosecutor who caused the complaint to be filed may [have drawn] a legal conclusion that probable cause existed, but that judgment was based almost entirely on the police investigation adjudged to be deficient by the jury." *Smiddy v. Varney*, 803 F.2d 1469, 1472 (*Smiddy*

---

[14]The City bases their entire causation argument on a California Court of Appeal's case, *Brewer v. Teano*, 40 Cal. App. 4th 1024 (1995). *Brewer* is a case that adopts a superseding cause analysis and then considers whether damages related to the defense of criminal charges for leaving the scene of a car accident were "forseeable" after Teano, the other driver, repeatedly collided with Brewer's vehicle. *Id.* at 1029-30. The court concluded that damages associated with Brewer's criminal defense for hit-and-run were not foreseeable because Brewer's flight from the scene was the "extraordinary rather than a normal result" of Teano's negligent driving. *Id.* at 1037. This conclusion was further supported by the fact that Brewer's criminal prosecution was further attenuated from the accident; it "operated independently from anything that Teano did," therefore, Teano's estate could not be held liable for "remote official acts of independent public officers" who subsequently charged Brewer. *Id.* Given these facts, *Brewer* does not support the City's argument that this case "explains" why the Task Force investigation was not, as a matter of law, a proximate cause of the Officers' damages under § 1983.

*II*); *see also Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991) (citing *Smiddy I* and finding that "police officers can be liable . . . if they made false reports to the prosecutor, omitted material information for the reports, or otherwise prevented the prosecutor from exercising his independent judgment.").

[13] First, the jury heard unrebutted testimony that the District Attorney was not, in fact, "independent" but worked "hand-in-hand" with the Task Force throughout the investigation. Garcetti explained that his office "relied on the information provided by the [Task Force] and the investigating officer[s]," and the Task Force detectives confirmed that their "ongoing daily interactions" with the District Attorney's office were instrumental to the Officers' arrest. On this record, the jury was entitled to believe that the Task Force and District Attorney were engaged in an essentially joint investigation, which interfered with the District Attorney's independent judgment and tainted the prosecution's ultimate decision to file charges, irrespective of testimony that the jury was not required to believe, that the decision was free from improper influence.

There was also additional evidence from which the jury could conclude that the prosecutor did not independently exercise his duty. The jury heard substantial evidence that the Task Force improperly exerted pressure on the District Attorney's office and failed to turn over evidence. Garcetti testified that Chief Parks both "hounded" Garcetti and his deputies to file charges in Rampart-related cases, and "intentionally hamper[ed]" the investigation. When Garcetti expressed caution about initiating a prosecution without a thorough investigation, Parks told him, "I don't care. Let's get the case behind us. If we prosecute the case, even if you lose the case, it's over. It's done." Although Chief Parks was not directly referring to the case against the Officers in that conversation, the jury could properly infer from the fact that the felony complaint was filed several weeks later, that Chief Parks' insistence that charges be filed contemplated the Officers'

prosecution. The Task Force also failed to provide the District Attorney with the statement of Hank Rodriguez, who had overheard Perez tell his cellmate that he had intentionally fabricated accusations against innocent officers. This statement, which was not disclosed until shortly before the Officers' criminal trial, was material that Garcetti testified should have been turned over to his office.

[14] The presumption of prosecutorial independence protects investigative officers unless the evidence shows that the officers interfered with the prosecutor's judgment by omitting relevant information or by pressuring the prosecutor to file charges. *See Newman*, 457 F.3d at 995. In light of the record, we conclude that the presumption was, in view of the evidence at trial and the jury's verdict, rebutted. It is the province of the jury to decide what testimony to credit; that there would not have been any arrests but for the District Attorney's office's decision to prosecute is not the only factual conclusion that can be drawn from the evidence. Here, the jury concluded that the City's policy caused the Officers' injuries and substantial evidence supports the jury's determination.

## IV.   Damages Award

[15] The City next challenges as "excessive" the jury's special verdict awarding each officer $5,000,001. We review this award for substantial evidence, *In re Exxon Valdez*, 270 F.3d 1215, 1247 (9th Cir. 2001), and afford "substantial deference to a jury's finding of the appropriate amount of damages," *Del Monte Dunes*, 95 F.3d at 1435.[15] Unless "the amount is

---

[15]In light of our causation analysis, we reject the City's argument that a new trial is warranted because the damages award was not apportioned into periods before and after the decision to prosecute. Because the Officers successfully rebutted the presumption of independent prosecutorial judgment, each Officer is entitled to all his damages caused by his arrest. *See Smiddy I*, 665 F.2d at 268.

grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork," we uphold the jury's award. *Id.*; *see also Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1040 (9th Cir. 2003). The evidence presented at trial and viewed in the Officers' favor justify the jury's damages verdict.

**[16]** Compensable injuries under § 1983 include "impairment of reputation, personal humiliation, and mental anguish and suffering." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986); *see also Johnson v. Hale*, 13 F.3d 1351, 1353 (9th Cir. 1994) (discussing compensatory damages under 42 U.S.C. § 1982). The testimony of the plaintiff alone can substantiate a jury's award of emotional distress damages. *See Zhang*, 339 F.3d at 1040 (9th Cir. 2003); *see also Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 513 (9th Cir. 2000). Although the City claims that there is no basis in the evidence for an identical award to each accused officer because their testimony showed differing levels of harm suffered by each, the record demonstrates that the harms suffered by the Officers were similar in content and quality.

Each officer testified about the adverse physical and emotional effects of the media attention and his loss of reputation. Harper developed high blood pressure and intestinal problems; he began to drink frequently and heavily and became paranoid. Ortiz became suicidal and experienced heartburn, back and neck pain, and anxiety attacks. Liddy gained 100 pounds, was hospitalized for chest pains, and developed high blood pressure and anxiety.

The Officers also testified as to the adverse effect the experience had on their personal and professional lives. Harper had to work lower-paying security jobs; his house was searched in front of his girlfriend and her young daughter; he was told he was put on a hit-list by a gang member shot and framed by Perez; and even after he was cleared of all charges

and returned to the LAPD he was unable to work on the street because of the publicity and had to take a desk job. Ortiz was also told he was on a hit-list; his family broke apart when his wife left him because of the negative publicity, and his teenage stepdaughter ran away, attempted suicide and was placed in a psychiatric ward. Liddy lost his career, filed for bankruptcy, and the negative publicity had significant adverse effects on his young children. This testimony is substantial evidence from which the jury could find that the harm to each officer justified an identical damage award.

Moreover, in *Lambert v. Ackerly*, 180 F.3d 997, 1011 (9th Cir. 1999), this court rejected an argument that a jury's damage award is suspect because the same amount of damages was awarded to each plaintiff. The court upheld the jury's damage award on the principle that "the emotional harm to each plaintiff was roughly equal *given the similar treatment each plaintiff suffered at the hands of the defendants*." *Id.* (emphasis added). In this case, as in *Lambert*, each officer experienced the same deprivation of their constitutional rights related to their wrongful arrests on the Lobos-related charges.

Next, the City argues that the damage award was not properly apportioned between the harms the Officers suffered from the Lobos incident and the harms that they suffered as a result of other criminal and disciplinary proceedings. This argument, which the City vigorously pursued at trial, is unpersuasive. There is no indication that the jury improperly took these other incidents into account, especially where, as here, the City has not challenged any aspect of the jury instructions. Rather, the jury had substantial evidence to conclude that, on the Lobos-related charges alone, the Officers suffered harm and should be awarded damages.

Nor, as the City argues, was the award "the product of the jury's prejudice . . . which arose from admission of the immaterial and inflammatory evidence." The jury's refusal to find

that Chief Parks acted with malice, fraud, or oppression belies the argument that the jury was unduly inflamed.

Finally, the City argues that "none of the accused officers presented any evidence of specific monetary damages, such as medical expenses or lost income." This argument is unpersuasive because this court does not require that damage awards must be supported by "objective" evidence. *See Zhang*, 339 F.3d at 1040 (concluding that Zhang's testimony alone was enough to substantiate the jury's award); *Chalmers v. City of Los Angeles*, 762 F.2d 753, 761 (9th Cir. 1985) (upholding damages based solely on testimony); *Johnson*, 13 F.3d at 1352 (noting that emotional damages may be awarded based on testimony alone or appropriate inference from circumstances).

## V.   Evidentiary Rulings

The City and Chief Parks moved *in limine* to preclude the admission of certain evidence, and objected to certain testimony at trial. They now appeal several of the court's evidentiary rulings.

We afford broad discretion to a district court's evidentiary rulings. *See Sprint/United Mgmt. Co. v. Mendelsohn*, ___ U.S. ___, 128 S. Ct. 1140, 1144-45 (2008). To reverse such a ruling, we must find that the district court abused its discretion and that the error was prejudicial. *McEuin v. Crown Equip. Corp.*, 328 F.3d 1028, 1032 (9th Cir. 2003). "A reviewing court should find prejudice only if it concludes that, more probably than not, the lower court's error tainted the verdict." *Tennison v. Circus Circus Enters., Inc.*, 244 F.3d 684, 688 (9th Cir. 2001). "A new trial is only warranted when an erroneous evidentiary ruling 'substantially prejudiced' a party." *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995) (citation omitted).

[17] The City provides no legal basis for any of their objections, nor do they specifically explain why any of the admit-

ted evidence was prejudicial. Harper's opinion that he was a "pawn" in the investigation could not reasonably have prejudiced the verdicts. The objected-to portions of the testimony of peripheral witnesses Cliff Armis, Sergeant Pascual, and Detective Wich likewise demonstrate no prejudice. To the extent that they testified to events immaterial to the constitutional violations at issue, there remains a wealth of evidence to support the jury's verdict. Accordingly, there is no basis to conclude that the district court abused its discretion in denying the City's evidentiary motions.

**AFFIRMED.**