NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**INGEVITY CORPORATION, INGEVITY SOUTH CAROLINA, LLC,**
*Appellants*

**v.**

**INTERNATIONAL TRADE COMMISSION,**
*Appellee*

**MAHLE FILTER SYSTEMS NORTH AMERICA, INC., MAHLE FILTER SYSTEMS JAPAN CORP., MAHLE SISTEMAS DE FILTRACIÓN DE MÉXICO S.A. DE C.V., MAHLE FILTER SYSTEMS CANADA ULC, KURARAY CO., LTD., CALGON CARBON CORPORATION,**
*Intervenors*

---

2020-1800

---

Appeal from the United States International Trade Commission in Investigation No. 337-TA-1140.

---

SEALED OPINION ISSUED: July 21, 2021

PUBLIC OPINION ISSUED:  August 6, 2021[*]

————————————

MARK ANDREW PERRY, Gibson, Dunn & Crutcher LLP, Washington, DC, argued for appellants.  Also represented by BRIAN BUROKER; TAYLOR KING, JEFFREY T. THOMAS, Irvine, CA.

RONALD TRAUD, Office of the General Counsel, United States International Trade Commission, Washington, DC, argued for appellee.  Also represented by DOMINIC L. BIANCHI, WAYNE W. HERRINGTON.

JEANNE MARIE GILLS, Foley & Lardner LLP, Chicago, IL, argued for intervenors MAHLE Filter Systems North America, Inc., MAHLE Filter Systems Japan Corp., MAHLE Sistemas de Filtración de México S.A. de C.V., MAHLE Filter Systems Canada ULC.  Also represented by DANIEL FLAHERTY, RICHARD SPENCER MONTEI; JUSTIN SOBAJE, Los Angeles, CA.

RAYMOND ALAN MILLER Troutman Pepper Hamilton Sanders LLP, Pittsburgh, PA, for intervenors Kuraray Co., Ltd., Calgon Carbon Corporation.

————————————

Before MOORE, *Chief Judge*[**], SCHALL and TARANTO, *Circuit Judges*.

SCHALL, *Circuit Judge*.

———————————

[*]    This opinion was originally filed under seal and has been unsealed in full.

[**]    Chief Judge Kimberley A. Moore assumed the position of Chief Judge on May 22, 2021.

DECISION

Ingevity Corp. and Ingevity South Carolina, LLC (collectively, "Ingevity") are the owners of U.S. Patent No. RE38,844 ("the '844 patent"). On November 8, 2018, Ingevity filed a complaint before the International Trade Commission ("the Commission") alleging a violation of 19 U.S.C. § 1337 ("section 337") due to the importation of products that infringed one or more claims of the '844 patent. In an amended complaint filed on March 28, 2019, Ingevity named MAHLE Filter Systems North America, Inc., MAHLE Filter Systems Japan Corp., MAHLE Sistemas de Filtración de México S.A. de C.V., MAHLE Filter Systems Canada, ULC, Kuraray Co., Ltd., and Calgon Carbon Corporation (collectively, "Intervenors") as Respondents.[1] Thereafter, following proceedings that included an evidentiary hearing before an administrative law judge ("ALJ"), on April 7, 2020, the Commission determined that Intervenors did not violate section 337 because the asserted claims of the '844 patent were invalid under 35 U.S.C. § 102(g)(2) and/or 35 U.S.C. § 103(a)[2] in view of a prior invention by engineers at non-party Delphi Technologies, Inc., or over the combination of that prior invention and other prior art. *In the Matter of Certain Multi-Stage Fuel Vapor Canister Systems and Activated Carbon Components Thereof,* Inv. No. 337-TA-1140, 2020 WL 1700337

---

[1] Nagamine Manufacturing Co., Ltd. was also named as a respondent in Ingevity's amended complaint, but is not a party to this appeal.

[2] This appeal is governed by 35 U.S.C. §§ 102(g)(2) and 103(a) as they existed prior to changes made by the America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284 (2011). *See Polara Eng'g Inc. v. Campbell Co.,* 894 F.3d 1339, 1344 n.2 (Fed. Cir. 2018); *Solvay S.A. v. Honeywell Int'l Inc.,* 742 F.3d 998, 1000 n.1 (Fed. Cir. 2014); 35 U.S.C. §§ 102(g)(2), 103(a) (2002).

(U.S.I.T.C. Apr. 7, 2020) (Not. of Comm'n Determination to Review in Part, Take No Position on the Issues Under Review, and Affirm in Part) ("*Commission Determination*"); *see also In the Matter of Certain Multi-Stage Fuel Vapor Canister Systems and Activated Carbon Components Thereof*, Inv. No. 337-TA-1140, 2020 WL 1026313 (U.S.I.T.C. Jan. 28, 2020) (Initial Determination) ("*Initial Determination*"). Ingevity now appeals the Commission's final determination. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(6). Because we are unpersuaded by Ingevity's arguments, we *affirm*.

BACKGROUND

I.

The '844 patent is directed to a method for reducing emissions resulting from gasoline evaporation from automobile fuel systems. '844 patent col. 1 ll. 27–34; col. 3 ll. 43–64. These emissions, which sometimes are referred to as "bleed emissions," typically occur when a vehicle has been parked and subjected to diurnal temperature changes over a period of several days. *Id.* col 2 ll. 45–46; col. 4 ll. 42–44. These temperature changes cause pressure fluctuations in the vehicle's fuel tank, which in turn cause gases to flow in and out of the fuel tank vent. *Initial Determination*, 2020 WL 1026313, at *6. One way to control bleed emissions is via "adsorption" and the storage of hydrocarbon vapors in a canister, followed by "desorption," facilitated by passing fresh air through the canister to purge the adsorbed hydrocarbons back into the fuel system, where they are burned in the internal combustion process. *See id.* at *6–7; '844 patent col. 1 ll. 32–38. In the relevant time period, adsorbents were commonly characterized in terms of their "butane working capacity," or "BWC." BWC describes the inherent ability of materials to adsorb and desorb hydrocarbons. *See id.* col. 2 ll. 1–16.

The '844 patent describes a method for controlling bleed emissions that uses two adsorbents. The first

adsorbent is closer to the fuel source (from which the vapors are coming) than the second adsorbent, which is closer to the vent (from which the vapors are being emitted).  The '844 patent generally describes the adsorption abilities of its two adsorbents in terms of "incremental adsorption capacity" ("IAC"), as opposed to BWC.  Although there are differences between how IAC and BWC are calculated, both measure the mass of adsorbate that is adsorbed by a unit of adsorbent at a particular temperature and vapor concentration.  *Initial Determination*, 2020 WL 1026313, at \*95.  The adsorptive properties of an adsorbent can be characterized using an "isotherm," a series of measured adsorption capacities of an adsorbent for various concentrations of an adsorbate at a specific temperature, which can be represented graphically.  *See id.* at \*53.

The '844 patent describes the first, fuel-side adsorbent as preferably being a "standard high working capacity carbon[]."  '844 patent col. 3 ll. 46–47.  The second, vent-side adsorbent preferably "exhibits a flat or flattened adsorbent isotherm on a volumetric basis[,] in addition to certain characteristically desirable adsorptive properties across broad vapor concentrations."  *Id.* col. 3 ll. 47–51.  These properties include "relatively low incremental capacity at high concentration vapors compared with the fuel source-side adsorbent volume."  *Id.* col. 3 ll. 51–53.  According to the '844 patent, using a vent-side adsorbent with a flatter adsorption isotherm results in "giv[ing] up less vapor into the purge stream and this purge will then be more efficient in reducing vapor concentrations deeper into the bed."  *Id.* col. 4 ll. 31–55.

Claim 1 of the '844 patent is representative.[3]  It recites:

---

[3]    Ingevity makes no arguments for claims other than claim 1, so the case rises or falls on that claim.

> 1.   A method for reducing fuel vapor emissions in automotive evaporative emissions control systems comprising the steps of contacting the fuel vapor with an initial adsorbent volume having incremental adsorption capacity at 25° C. of greater than 35 g n-butane/L between vapor concentrations of 5 vol % and 50 vol % n-butane and at least one subsequent adsorbent volume having an incremental adsorption capacity of less than 35 g n-butane/L between vapor concentrations of 5 vol % and 50 vol % n-butane.

'844 patent col. 10 ll. 36–44.  We refer to the two steps of claim 1 as the "first adsorbent step" and the "second adsorbent step," respectively.

## II.

In the 1999–2000 timeframe Delphi was working on reducing evaporative emissions.  This work led to the development of Delphi's own fuel canister system (variously referenced in the record as the "Delphi Prior Invention," "Delphi Epsilon Canister System," or "DECS").  The parties agree that the Delphi Prior Invention was reduced to practice prior to the '844 patent's priority date.  The Delphi Prior Invention included a conventional carbon canister and an auxiliary canister containing carbon honeycombs.  *Initial Determination*, 2020 WL 1026313, at *89.  The Delphi engineers, Thomas Meiller, Susan LaBine, and Charles Covert, determined that the Delphi Prior Invention improved bleed emissions, and sought and received their own patent.  *Id.* at *89, 93; *see* U.S. Patent No. 6,896,852 to Meiller et al. ("Meiller").  We refer to Mr. Meiller, Dr. LaBine, and Mr. Covert as the "Delphi Inventors."

## III.

In its complaint, Ingevity alleged violation of section 337 based upon infringement of claims 1–5, 8, 11, 13, 18,

19, 21, 24, 31, 33, 36, 38, 43, 45, 48, and 50[4] of the '844 patent.[5]    As noted, Ingevity subsequently amended the complaint to include Intervenors as Respondents.  In due course, the Commission instituted proceedings, and the matter was assigned to an ALJ.

In the *Initial Determination*, dated January 28, 2020, the ALJ held that the asserted claims of the '844 patent were anticipated by the Delphi Prior Invention and/or obvious in view of the Delphi Prior Invention or the combination of the Delphi Prior Invention and other references. 2020 WL 1026313, at *97.  The ALJ also held, *inter alia,* that the asserted claims were rendered obvious over Meiller and/or U.S. Patent No. 5,914,294 to Park et al. ("Park") and other references.  *Id.* at *103.

Before the ALJ, the parties do not appear to have disputed that the Delphi Prior Invention met the first adsorbent step limitation of claim 1.  Considering the second adsorbent step limitation of claim 1, in view of evidence suggesting that the Delphi Inventors were supplied with honeycombs having a BWC of 3.7 g/dL, the ALJ found it to be "a reasonable inference that the BWC of the honeycombs contained in the DECS would also have been 3.7g/dL," which the ALJ found to correlate "to an IAC of under 35 g/L," thereby satisfying the requirements of the second adsorbent step limitation of claim 1.  *Initial Determination*,

---

[4]    Initially, Ingevity also asserted claims 15, 28, 40, and 52 of the '844 patent.  Ingevity later withdrew its assertions of infringement with respect to those claims.

[5]    Section 337 prohibits the "importation into the United States, the sale for importation, or the sale within the United States after importation" of articles that "infringe a valid and enforceable United States patent."  19 U.S.C. § 1337(a)(1)(B).

2020 WL 1026313, at *89, 96.[6]  The ALJ also determined that the Delphi Inventors appreciated that they had constructed a canister system that improved bleed emissions performance relative to conventional carbon canisters and did not "abandon, suppress, or conceal their invention." *Id.* at *89–93.

Both Ingevity and Intervenors petitioned for the Commission to review various aspects of the ALJ's *Initial Determination*.   In addition to other issues, Ingevity petitioned for review of the ALJ's determination that the Delphi Prior Invention rendered the asserted claims invalid and the ALJ's determination that the asserted claims were invalid over the combination of Meiller, Park, and/or other references.  The Commission determined to review the issue of obviousness over Meiller, Park, and/or other references, as well as six other issues.  However, the Commission determined not to review the ALJ's ruling of invalidity based on the Delphi Prior Invention.  *Commission Determination*, 2020 WL 1700337, at *2–3.  Ultimately, the Commission decided "to take no position on the issues under review." *Id.*  The Commission found no violation of section 337 "based on the unreviewed findings of the [*Initial Determination*] that the asserted claims have been shown to be invalid under 35 U.S.C. [§] 102 and/or 35 U.S.C. [§] 103 over the Delphi [P]rior [I]nvention, or the combination of the Delphi [P]rior [I]nvention with other references." *Id.* at *3.  This appeal followed.

DISCUSSION

I.

We review the Commission's final determination under the standards of the Administrative Procedure Act, 5

---

⁶    For purposes of this appeal, Ingevity does not challenge the ALJ's finding that a BWC of 8 g/dL roughly correlates with an IAC of 35 g/L.  Appellant's Br. 55 n.5.

U.S.C. § 706; *Mayborn Grp., Ltd. v. Int'l Trade Comm'n*, 965 F.3d 1350, 1353 (Fed. Cir. 2020). We review the Commission's legal determinations *de novo* and its factual findings for substantial evidence. *Id.* "Priority of invention and its constituent issues of conception and reduction to practice are questions of law predicated on subsidiary factual findings." *Singh v. Brake*, 317 F.3d 1334, 1350 (Fed. Cir. 2003). Patent invalidity is an affirmative defense to an action for infringement before the Commission. *Mayborn*, 965 F.3d at 1355 (citations omitted). "All factual propositions and inferences underlying an invalidity defense must be proven by clear and convincing evidence." *Id.* (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011)).

## II.

As noted, the pre-AIA version of 35 U.S.C. § 102(g)(2) governs this appeal. Pre-AIA § 102(g)(2) provided:

A person shall be entitled to a patent unless—

. . .

(g) . . . (2) before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it. In determining priority of invention under this subsection, there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

In order to establish an actual reduction to practice, the prior inventor must have (1) constructed an embodiment or performed a process that met all the limitations of the claim(s) at issue and (2) determined that the invention would work for its intended purpose. *Mycogen Plant Sci. v.*

*Monsanto Co.*, 243 F.3d 1316, 1332–33 (Fed. Cir 2001).[7] Consistent with this second requirement and the requirement of conception that inventors must form in their minds a "definite and permanent idea of the complete and operative invention," *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986), an alleged prior invention will not anticipate under 35 U.S.C. § 102(g) unless the alleged prior inventors "appreciated" the invention. *See Dow Chem. Co. v. Astro-Valcour, Inc.*, 267 F.3d 1334, 1341 (Fed. Cir. 2001). Specifically, "the inventor must contemporaneously appreciate that the embodiment worked and that it met all the limitations of the [claims]." *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998). However, it is not required that "[a prior inventor] establish that he recognized the invention in the same terms as those recited in the [claims]. The invention is not the language of the [claims] but the subject matter thereby defined." *Dow Chem.*, 267 F.3d at 1341 (quoting *Silvestri v. Grant*, 496 F.2d 593, 597 (C.C.P.A. 1974)).

For purposes of its appeal, Ingevity does not argue that the Delphi Prior Invention did not satisfy the limitations of claim 1 of the '844 patent.[8] Ingevity also does not dispute

---

[7]    We refer to the claims of the '844 patent as representing the invention at issue, as opposed to an interference "count," because this is not an interference proceeding under pre-AIA 35 U.S.C. § 135. *Mycogen*, 243 F.3d at 1332–33.

[8]    To the extent that counsel for Ingevity suggested otherwise at oral argument, *see, e.g.*, Oral Arg. at 39:13–40:35 (Mar. 4, 2020), available at http://oralarguments. cafc.uscourts.gov/default.aspx?fl=20-1800_03042021.mp3, we find this argument to have been waived because it was not set forth in Ingevity's opening brief. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006).

that Delphi did not abandon, suppress or conceal its invention. And finally, as noted above, there is no dispute that Delphi's reduction to practice of the Delphi Prior Invention was prior to Ingevity's earliest priority date. Instead, Ingevity argues that Intervenors did not meet their burden of establishing, by clear and convincing evidence, that the Delphi Inventors appreciated that the Delphi Prior Invention included all the limitations of claim 1 of the '844 patent for purposes of establishing a prior reduction to practice, and thus an anticipating prior invention under § 102(g)(2).

## III.

As seen, claim 1 of the '844 patent is a method claim having two steps. The first adsorbent step involves contacting the fuel vapor "with an initial adsorbent volume having incremental adsorbent capacity . . . of greater than 35 g n-butane/L." In pertinent part, the second adsorbent step is contacting the fuel vapor with "at least one subsequent adsorbent volume having an incremental adsorption capacity of less than 35 g n-butane/L." '844 patent col. 10, ll. 37–44. Ingevity's principal contention on appeal is that the ALJ erred in determining that the Delphi Inventors appreciated that the Delphi Prior Invention performed the second adsorbent step. According to Ingevity, without having contemporaneously recognized and appreciated that step, the Delphi Inventors merely accidentally duplicated the invention defined by the claims of the '844 patent. Specifically, Ingevity argues that nowhere in his *Initial Determination* did the ALJ "find (or even suggest)" that the Delphi Inventors appreciated that the honeycombs in the auxiliary canister of the Delphi Prior Invention had an IAC below 35 g/L. *See* Appellant's Br. 30 ("Because the Delphi engineers never appreciated the claimed limitations—particularly the IAC of the honeycombs in the secondary canister—they did not conceive of the invention claimed in the '844 Patent."); *id.* at 49–50 ("[N]ot having appreciated a subsequent adsorbent volume with an IAC below 35 g/L, the Delphi engineers did not conceive of or appreciate the

entirely different invention disclosed and claimed by Ingevity"); *id.* at 51 ("In sum . . . the prior inventor must have appreciated a subsequent adsorbent volume with an IAC below 35 g/L."); *id.* at 54 ("Nowhere in its discussion of Respondents' Section 102(g)(2) invalidity defense did the ALJ find (or even suggest) that the Delphi engineers appreciated that the DECS's honeycombs had an IAC below 35 g/L."); *id.* at 55 ("The ALJ did not find that the Delphi engineers appreciated that the BWC of the DECS's honeycombs was below 8 g/dL.").[9]

## IV.

We agree with Ingevity that Intervenors were required to prove by clear and convincing evidence that the Delphi Inventors appreciated that the auxiliary canister of the Delphi Prior Invention included an adsorbent that had an IAC of less than 35 g/L, or its correlative for purposes of this appeal: a BWC of less than 8 g/dL. *See Mycogen*, 243 F.3d at 1336. We conclude, however, that substantial evidence supports the finding that Intervenors carried that burden.

There are several critical pieces of evidence bearing on this point. First is a letter dated October 28, 1999, from James R. Miller, Ph.D., Technical Manager for New

---

[9]    At oral argument, counsel for Ingevity also argued that the Delphi Inventors needed to appreciate the causative role played by the Delphi Prior Invention's honeycombs in reducing bleed emissions. *See, e.g.*, Oral Arg. at 10:05–11:48. Ingevity waived this argument, however, because its briefing was limited to the argument that the Delphi Inventors did not appreciate that the honeycombs in the Delphi Prior Invention's auxiliary canister had an IAC below 35 g/L. *See SmithKline Beecham*, 439 F.3d at 1319 ("Our law is well established that arguments not raised in the opening brief are waived.").

Product Development at Westvaco Corporation ("Westvaco") to Mr. Meiller, one of the three Delphi Inventors. J.A. 11160. Dr. LaBine and Mr. Covert, the other two Delphi Inventors, are copied on the letter. *Id.* In the letter, Dr. Miller informs Mr. Meiller that he is shipping "two developmental honeycomb samples for your work on reducing canister bleed emissions," and he lists as an attachment to the letter the "basic properties" that Westvaco had measured for the two honeycomb samples. *Id.* Among the "basic properties" listed is "Volumetric Butane Working Capacity, g/[dL]" of "3.7." J.A. 11161. A second piece of evidence is a letter dated December 7, 1999, from Dr. Miller to Mr. Meiller, and again copying Dr. LaBine and Mr. Covert. J.A. 11162. The letter indicates that "[a]s requested," Westvaco had "shipped to [Mr. Meiller's] attention six honeycomb parts [that] have been given the Sample Number 445-S-99." J.A. 11162–63. The letter states that the honeycomb parts "were made with the same carbon, formation and cell density as the previous parts [Mr. Meiller] tested." *Id.* The last piece of evidence is the physical auxiliary canister of the Delphi Prior Invention, which was produced at the deposition of Dr. LaBine. The canister has a tag indicating that the honeycombs inside are sample number 445-S-99. 2020 WL 1026313, at *89.

As noted, based upon this evidence, the ALJ found it to be a "reasonable inference" that the honeycombs contained in the Delphi Prior Invention also would have had a BWC of 3.7 g/dL, *Initial Determination*, 2020 WL 1026313, at *89, which the ALJ found to correlate to the IAC of below 35g/L required in the second adsorbent step limitation of claim 1. *Id.* at *96. We believe that the two letters and the physical auxiliary canister constitute substantial evidence that the Delphi Inventors appreciated that the honeycombs of the Delphi Prior Invention had the pertinent adsorptive capacity, regardless of whether they were defined in terms of BWC or IAC. *See Dow Chem.*, 267 F.3d at 1341. That is, the inventors had before them, and knowingly utilized

in a method that they knew worked to reduce fuel vapor emissions, an adsorbent that they had been informed met in substance the second adsorbent step of claim 1. *See Mycogen*, 243 F.3d at 1337 ("Although the amount of evidence regarding appreciation of each specific claim limitation is not extensive, we find that it is legally satisfactory, particularly in light of the extensive evidence establishing that Monsanto performed a process that met all of the limitations of the claims, and that the resulting product was successfully tested and appreciated to work for its intended purpose."); *see also Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1064 (Fed. Cir. 2005) ("The priority determination requires evidence that the inventor actually first made the invention, and that he understood his creation to have the features that[] comprise the inventive subject matter at bar.").

Ingevity asserts that the ALJ did not expressly find that the Delphi Inventors appreciated that the honeycombs of the Delphi Prior Invention's auxiliary canister had the pertinent adsorptive capacity. But we think that the ALJ did so find. The ALJ found: "The record shows that the individuals associated with the DECS sufficiently appreciated their invention under 102(g)(2)." *Initial Determination*, 2020 WL 1026313, at *90; *see also id.* at 93. In view of the substantial evidence illustrating the Delphi Inventors' appreciation that the honeycombs of the Delphi Prior Invention's auxiliary canister had the pertinent adsorptive capacity discussed above, we read the ALJ's statement as making the finding that Ingevity says is missing.

V.

In its second argument on appeal, Ingevity requests that we "make clear" that the determinations of the ALJ that the Commission chose to review, but with respect to which the Commission ultimately took no position, are vacated by operation of law. Appellant's Br. 56–61. Because it cannot now seek further review of the ALJ's

determinations due to "happenstance," Ingevity argues, we should follow the "equitable tradition" that unreviewable decisions should be vacated. *Id.* at 59 (quoting *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18, 25 (1994) and *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39–40 (1950)). Specifically, Ingevity states that it "is concerned that its opponents may attempt to use the ALJ ruling [of obviousness over Meiller, Park, and/or other references] against it in the district court." Appellant's Br. 58–59.

We do not agree that the ALJ's determinations that the Commission chose to review but on which it took no position should be vacated by operation of law. That a judgment may be vacated where the case becomes moot by happenstance while on appeal is a matter "not of constitutional necessity but of remedial discretion." *LSI Corp. v. U.S. Int'l Trade Comm'n*, 604 F. App'x 924, 930 (Fed. Cir. 2015). We decline to exercise that discretion here. Even if the ALJ's *Initial Determination* were treated as a final Commission determination, it would "have no preclusive effect in other forums." *Tex. Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1569 (Fed. Cir. 1996); *see* Appellant's Br. 58. And, to the extent a litigant invokes the ALJ's decision in another tribunal for the persuasiveness of its reasoning, "the success of that invocation depends on the decision's content, not its status." *LSI Corp.*, 604 F. App'x at 930. That tribunal may "decide what if any effect the decision should have." *Id.*

## CONCLUSION

We have considered Ingevity's other arguments on appeal and find them to lack merit. For the foregoing reasons, we affirm the Commission's final determination.

**AFFIRMED**